***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Taylor, along with the briefs and arguments on appeal. The appealing party has shown good ground to receive further evidence or to amend the prior Opinion and Award. Accordingly, the Full Commission MODIFIES the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing on 30 July 2002 as:
 STIPULATIONS
1. On 8 June 2000, the parties were subject and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between the parties on 8 June 2000.
3. Plaintiff's average weekly wage will be determined from payroll records submitted.
4. Plaintiff was employed by defendants on 8 June 2000 as a lot shuttler/coordinator, when he stepped into a hole and twisted his knee.
5. Defendants have paid no temporary partial disability or temporary total disability benefits.
6. The parties stipulated into evidence as Stipulated Exhibit 1, a packet of plaintiff's medical records.
7. The parties stipulated into evidence as Stipulated Exhibit 2, Industrial Commission forms.
8. The parties stipulated into evidence as Stipulated Exhibit 3, plaintiff's payroll records.
9. Defendants agreed that plaintiff sustained a compensable injury to his right knee on 8 June 2000.
10. Defendants agreed to authorize medical treatment by Dr. Griffin in the future and will pay temporary total disability to plaintiff from that treatment forward.
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 54-year-old male, born 14 November 1947. Plaintiff became employed with defendant-employer in December 1999 as a lot shuttler/coordinator. Plaintiff was not under any medical restrictions at the time he became employed with defendant-employer.
2. Plaintiff had injured his right knee previously in 1996 and underwent arthroscopic surgery for a torn meniscus performed by Dr. Oweida. Plaintiff was released to return to work from that injury in 1998 and was not given any permanent restrictions or permanent partial disability.
3. As a lot shuttler/coordinator, plaintiff was responsible for inspecting all cars to make sure that they were clean, in the correct space, that the mileage was correct, for retrieving and parking vehicles, gassing cars, etc. The car lot in which plaintiff worked covered approximately six football fields in area and plaintiff's job required a significant amount of walking.
4. On 8 June 2000, plaintiff sustained an admittedly compensable injury by accident when he injured his right knee as he exited a vehicle and placed his foot in a low area, twisting his knee.
5. Plaintiff was first provided medical treatment for his 8 June 2000 injury on 28 June 2000. Plaintiff was seen at First Family Physicians were he was treated conservatively. When plaintiff did not improve, he was referred to Dr. William Griffin at Charlotte Orthopaedic Specialists.
6. Plaintiff presented to Dr. Griffin on 10 July 2000 and was diagnosed with osteoarthritis of the right knee, with a work-related injury aggravating his symptoms. Plaintiff was treated conservatively and released to return to work with the restrictions of no lifting greater than ten pounds, sedentary work with standing or walking not to exceed fifteen minutes per hour.
7. Defendant-employer provided plaintiff a modified light-duty clerical position that was within his restrictions. This modified light duty job was tailored by the defendant-employer to compensate for plaintiff's physical restrictions. This job is not a reflection of plaintiff's wage-earning capacity. Plaintiff worked this modified light-duty clerical position until 5 October 2000.
8. Plaintiff's condition failed to improve. On 31 July 2000 an MRI was ordered and plaintiff's restrictions were continued. An 25 August 2000 review of plaintiff's MRI revealed a partial lateral meniscectomy (prior surgery) with a loss of articular cartilage in the lateral compartment consistent with osteoarthritis and bony changes, was suggestive of a bone bruise and some swelling on the bone. The MRI ruled out a meniscal tear as the source of plaintiff's pain.
9. As of 25 August 2000, Dr. Griffin was of the opinion that plaintiff had pain and that there were a number of potential sources of his pain. One potential source was arthritis in his knee, a second, the bone bruise and a third, a plica (soft tissue in the pouch of his knee). Dr. Griffin was of the opinion that arthroscopy might provide a better idea as to what was leading to plaintiff's pain. However, his opinion was also that plaintiff might expect a 50% success rate with regard to the lessening of his pain at that time which might last for approximately two years.
10. Defendant-carrier did not approve this surgery. Dr. Griffin continued plaintiff's restrictions.
11. In early October 2000, defendant-employer placed plaintiff in a modified light duty position as a Mobile III driver. Plaintiff picked up and dropped off employees/clients on a shuttle. Plaintiff performed the job of modified Mobile III driver up through his termination on or about 12 September 2001.
12. From 11 November 2000 until 10 May 2002, defendants did not authorize plaintiff to return to Dr. Griffin for treatment. At plaintiff's 11 November 2000 visit, Dr. Griffin continued plaintiff on the restrictions given 10 July 2000.
13. When plaintiff returned to Dr. Griffin on 10 May 2002, he complained of pain in his right knee, a progressive knock knee deformity, daily pain, and intermittent swelling of the knee especially with activity. At that time an x-ray revealed the bone rubbing against the bone in plaintiff's knee.
14. On 10 May 2002, Dr. Griffin was of the opinion that an arthroscopy would no longer be of benefit to plaintiff and recommended anti-inflammatories and occasional cortisone injections to the knee. Dr. Griffin was further of the opinion that plaintiff would require a total knee replacement and should undergo that procedure as required.
15. Dr. Griffin was of the opinion that plaintiff has not reached maximum medical improvement and retains the same restrictions that he had in November 2000. Dr. Griffin was of the opinion that plaintiff would continue to have restrictions but that following his knee replacement his restrictions might be slightly less.
16. Dr. Griffin was of the opinion that plaintiff's knee condition including the necessity of a knee replacement was caused by plaintiff's compensable injury by accident on 8 June 2000 at which time plaintiff experienced a significant change in his symptoms and aggravated his pre-existing knee condition.
17. In Dr. Griffin's deposition, he testified that he was not optimistic that the results of an arthroscopy would resolve plaintiff's symptoms or cure his knee condition, as the results were approximately a 50% success rate for approximately two years.
18. Between the time plaintiff saw Dr. Griffin in November 2000 and his return to Dr. Griffin in May 2002, plaintiff sought treatment from Dr. Taub in April 2001 and Dr. Oweida in September 2001.
19. Plaintiff was terminated by defendant-employer on or about 12 September 2001. Plaintiff's termination was a result of an economic downturn in business following the event of the terrorist bombings on 11 September 2001.
20. During the period of time following plaintiff's termination from defendant-employer he was released to return to work within his restrictions but admittedly did not engage in any active job search as he was "waiting for litigation that was pending to be resolved." Plaintiff did earn some wages, which he estimated to be approximately $3,000.00 for interior design work. Plaintiff did not engage in further job search other than his interior design work due to the fact that his litigation was pending, that he had limited transportation and that his apartment was not "bus friendly."
21. Plaintiff claims that he is owed temporary partial disability compensation from the time he was placed on light duty work until he was terminated on or about 12 September 2001, due to the lack of overtime available in his modified Mobile III driver position.
22. Plaintiff's wages were not decreased from 8 June 2000 through 12 September 2001.
23. Plaintiff's diminution in wage earnings due to a lack of overtime during the period from 8 June 2000 through 12 September 2001 was not causally related to his right knee injury and resulting restrictions.
24. On 8 June 2000, plaintiff sustained a compensable injury by accident to his right knee.
25. From 28 June 2000 through 12 September 2001, plaintiff worked modified light duty jobs tailored by the defendant-employer to compensate for plaintiff's physical restrictions. These jobs are not a reflection of plaintiff's wage-earning capacity.
26. On or about 12 September 2001, plaintiff was terminated from his employment.
27. Following plaintiff's termination he was released to return to work and did not engage in any active job search because it would not have made sense to do so in his opinion because he was waiting for the results of his workers' compensation litigation.
28. Plaintiff is not entitled to sanctions for defendants' refusal to authorize medical treatment in that Dr. Griffin was not of the opinion that an arthroscopy on plaintiff was more likely than not reasonably necessary to effect a cure, give relief, or lessen plaintiff's symptoms. Defendants had a reasonable and good faith basis for not authorizing the procedure.
29. As a result of his compensable injury, plaintiff is entitled to continuing treatment by Dr. Griffin for his right knee injury and to compensation for any temporary total disability resulting from such treatment. Plaintiff's treatment by Dr. Taub and Dr. Oweida in 2001 was a result of his compensable injury and was reasonably necessary.
30. There is a substantial risk that plaintiff will require future medical treatment for his knee and it has been indicated that he will more likely than not require a total knee replacement.
31. Plaintiff has not reached maximum medical improvement.
32. The Full Commission finds that plaintiff's applicable average weekly wage is $490.15, which yields a weekly compensation rate of $326.77.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On 8 June 2000, plaintiff sustained a compensable injury by accident to his right knee arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. The modified light-duty clerical position and the modified Mobile III driver position were make-work positions that are not readily available in the competitive marketplace. Peoples v. Cone Mills Corp.,316 N.C. 462, 342 S.E.2d 798 (1986). Therefore, those positions as well as the limited interior design work plaintiff attempted do not establish any wage-earning capacity on the part of the plaintiff. Id.
3. As a result of the 8 June 2000 injury, the plaintiff remains disabled and is entitled to be paid by the defendant ongoing total disability at a weekly rate of $326.77 from 8 June 2000 and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
4. The plaintiff is entitled to have defendant pay for all related medical expenses incurred or to be incurred as a result of the 8 June 2000 injury, including treatment by Dr. Griffin for his right knee injury and to compensation for any temporary total disability resulting from such treatment. Plaintiff's treatment by Dr. Taub and Dr. Oweida in 2001 was a result of his compensable injury and was reasonably necessary. N.C. Gen. Stat. § 97-25.
5. Defendants are entitled to a credit for the wages plaintiff received in the modified light-duty clerical position, in the modified Mobile III driver position, and for the limited interior design work. N.C. Gen. Stat. § 97-42.
6. The plaintiff is not entitled to temporary partial disability for the time he worked the modified jobs. N.C. Gen. Stat. § 97-30.
7. Plaintiff is not entitled to sanctions for defendants' refusal to authorize medical treatment in that Dr. Griffin was not of the opinion that an arthroscopy on plaintiff was more likely than not reasonably necessary to effect a cure, give relief, or lessen plaintiff's symptoms. Defendants had a reasonable and good faith basis for not authorizing the procedure. N.C. Gen. Stat. § 97-25.
8. There is a substantial risk that plaintiff will require future medical treatment for his knee as a result of the compensable injury. He will likely require a total knee replacement and is entitled to have defendants pay for this treatment. N.C. Gen. Stat. § 97-25.
9. Plaintiff has not reached maximum medical improvement.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Subject to the credit for wages earned in the modified jobs and the limited interior design work, and the attorney fee approved herein, the defendants shall pay to the plaintiff ongoing total disability compensation at a weekly rate of $326.77 for the period of 8 June 2000 through the present and continuing until further Order of the Commission. From the amounts that have accrued, this compensation shall be paid to the plaintiff in a lump sum. This compensation is subject to the attorney's fee approved herein.
2. The defendants shall pay for all related medical expenses incurred or to be incurred, including treatment by Dr. Griffin and any potential temporary total disability compensation resulting from such treatment.
3. A reasonable attorney fee of twenty-five percent of the compensation due plaintiff under Paragraph 1 of this AWARD is approved for plaintiff's counsel and shall be paid as follows: twenty-five percent of the lump sum shall be deducted from that sum and paid directly to plaintiff's counsel. Thereafter, every fourth weekly check shall be paid directly to plaintiff's counsel.
4. Plaintiff's claims for various penalties and sanctions are hereby DENIED.
5. Defendants shall pay the costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_____________ PAMELA T. YOUNG COMMISSIONER